**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**GEORGIA MAYE MCCOY, ET AL.**                                                   **PLAINTIFFS**

**V.**                                                 **CIVIL ACTION NO.: 1:08CV144-SA-JAD**

**LOWNDES COUNTY, MISSISSIPPI, ET AL.**                                **DEFENDANTS**

<u>MEMORANDUM OPINION</u>

Presently before the Court is Defendants' Motion for Summary Judgment [32] and Motion for Summary Judgment on Qualified Immunity [53]. After careful consideration, the Court finds as follows:

FACTS AND PROCEDURAL BACKGROUND

On November 18, 2006, Nick "N.S." Gordon was shot and killed during an altercation with Lowndes County Sheriff's Deputies Marc Miley and Archie Williams. Deputies Miley and Williams responded to an emergency 911 call at the address of 169 Applewood Wood Drive, Apartment 19 in Columbus, Mississippi. Deputies Miley arrived first and questioned Stephanie Thompson, resident of the apartment and the 911 caller. Stephanie stated that at 7 p.m., she and Ashley Thompson went outside the apartment. She alleged that Gordon appeared, grabbed Ashley, pushed her up against the wall, and started choking her. Deputy Miley observed red marks around Ashley's throat. According to Deputy Miley, Stephanie stated that Gordon had a nail gun with him and that he may be on the stairs outside.

After taking statements from Stephanie and Ashley, Deputy Miley located Gordon sitting at the top of an outside staircase near Stephanie's apartment. Deputy Miley approached the staircase and told Gordon he needed to talk to him. Gordon drew a gun-like object which Deputy Miley

assumed was a nail gun.[1] About this time, Deputy Williams drove up and assessed the situation. He exited his police cruiser and noticed Gordon pointing the chrome object[2] at Deputy Miley. Deputy Williams approached the staircase and drew his gun. Both deputies yelled for Gordon to drop the weapon. Gordon refused to drop the weapon and alternated pointing it at both deputies. Deputy Williams testified that as he approached, Deputy Miley informed him the weapon was a nail gun. Once Deputy Williams realized it was a nail gun, he decided to holster his gun and use his taser instead. Both deputies discharged their tasers numerous times on Gordon trying to get him to put down the weapon. The deputies testified that the tasers did not phase Gordon at all, and he continued to disobey their orders by refusing to drop the weapon. Deputy Williams approached Gordon to get a closer shot with his taser. Gordon swung at Williams with the weapon and hit Williams in his right shoulder. Then Gordon hit Deputy Williams squarely on the top of his head with the object. The blow knocked Williams to the ground and gashed open the back of his head. Deputy Miley attempted to intervene and was also struck over the head and knocked to the ground. As soon as Deputy Williams gained his composure, he saw Gordon crouched over Deputy Miley continuously hitting him over the head. Both deputies had open wounds on their heads and were bleeding profusely from those wounds.

Plaintiffs and Defendants both rely on the sworn statement of Gloria Ann Brown, an eyewitness to the altercation. Brown observed the two officers standing along the staircase of the

---

[1] Plaintiffs contend Gordon was unarmed. Plaintiffs, however, have provided no summary judgment evidence in support of this contention. Plaintiffs have provided the unsworn statement of Samona Brooks, resident of Applewood Apartment number 17. Although the Court will not rely on this unsworn statement, the Court will note that Brooks' statement corroborates Defendants assertion that Gordon had a nail gun. Brooks stated that Gordon "had a silver thing the police told him to put it down. . . ."

[2] Officer Williams testified that the object Gordon was holding appeared to be a gun-shaped weapon and looked like it was $CO_2$ powered, not an actual firearm.

apartment talking to Gordon. She heard the officers tell him to come downstairs. According to Brown, Gordon walked up the stairs towards the balcony and away from the officers. She then heard one of the officers tell Gordon, "drop it, drop it." Shortly thereafter, she heard the stun gun off. The officers yelled for Gordon to "get down, get down." Gordon refused and began fighting with the officers. Although she was not sure what the object was, Brown stated that Gordon hit one of the officers in the back of the head with something. She knew it was something besides just his fist as it made a sound when it struck the officer's head. Brown immediately saw blood pouring all from over the officer's head. Brown then witnessed the other officer getting hit by Gordon several times. Brown stated that this officer was also hit with something as well because he was staggering. The officer continued to fight off Gordon. Finally, the officer pulled his gun and fired two shots at Gordon. Gordon fell to the balcony floor and swung at the officer one more time. The officer then was able to grab Gordon's hands and handcuff them. Brown estimates the altercation lasted approximately four to five minutes before the shooting took place.

Plaintiffs, wrongful death beneficiaries of Gordon, filed suit against the Defendants, in their official and individual capacities, alleging violations of Gordon's First, Fourth, and Fourteenth Amendment rights. Further, Plaintiffs allege state law claims of intentional and/or negligent infliction of emotional distress and civil assault and battery. Defendants have moved for the entry of summary judgment as to Plaintiffs' claims and assert the defense of qualified immunity.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV.

P. 56(C). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law. An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." Ginsberg 1983 Real Estate P'ship v. Cadle Co., 39 F.3d 528, 531 (5th Cir. 1994) (internal citations omitted). The party moving for summary judgment bears the initial responsibility of apprising the district court of the basis for its motion and the parts of the record which indicate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

"Once the moving party presents the district court with a properly supported summary judgment motion, the burden shifts to the nonmoving party to show that summary judgment is inappropriate." Morrison v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). But the nonmovant must "do more than simply show that there is metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Moreover, "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. Anderson, 477 U.S. at 252, 106 S. Ct. 2505. The nonmovant must instead come forward with "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(E).

## ANALYSIS

The Court considers first Plaintiffs' federal claims against the Defendants. In the Complaint, Plaintiffs allege a list of constitutional violations, most of which are plainly inapposite to the facts of this case. For example, Plaintiffs allege violations of the First Amendment and Equal Protection

Clause of the Fourteenth Amendment. In the Court's view, the only federal claim which even arguably exists in this case is Plaintiffs' Section 1983 claim based upon allegations of excessive force pursuant to the Fourth Amendment.

I.  Deputies Miley and Williams–Individual Capacity Claims and Qualified Immunity

Plaintiffs allege Deputies Miley and Williams violated Gordon's Fourth Amendment right to be free from excessive force, as incorporated to the states through the Fourteenth Amendment. The officers assert that they are entitled to qualified immunity, and that the Plaintiffs failed to provide proof of the necessary elements to establish an excessive force claim. Plaintiffs allege the violation occurred from the use of lethal of force. It is undisputed that Deputy Williams was the officer that shot Gordon, not Deputy Miley. The Court, therefore, only will address the excessive force claim as to Deputy Williams.

A.  Qualified Immunity Standard

"Qualified immunity is designed to protect government officials in limited circumstances." Hathaway v. Bazany, 507 F. 3d 312, 320 (5th Cir. 2007). The immunity protects officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). This means that "[e]ven law enforcement officials who reasonably but mistakenly commit a constitutional violation are entitled to immunity." Goodson v. City of Corpus Christi, 202 F. 3d 730, 736 (5th Cir. 2000) (quoting Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991)).

"[C]ourts evaluating § 1983 claims based on allegedly unconstitutional conduct by state

actors should conduct a two-prong inquiry to determine whether the state actors are entitled to qualified immunity." McClendon v. City of Columbia, 305 F. 3d 314, 323 (5th Cir. 2002) (en banc) (per curiam) (citing Siegert v. Gilley, 500 U.S. 226, 232-34, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991)). "The first step is to determine whether the plaintiff alleged a violation of a clearly established constitutional right." Colston v. Barnhart, 130 F. 3d 96, 99 (5th Cir. 1997).

If the plaintiff's allegations, taken as true, would violate a constitutional right, "the next, sequential step is to ask whether the right was clearly established" at the time the challenged conduct occurred. Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). To determine if a right is clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

Until recently, courts were required to address these prongs in order, first determining whether a constitutional violation occurred. Saucier, 533 U.S. at 201, 121 S. Ct. 2151. However, the United States Supreme Court overruled that mechanical approach in Pearson v. Callahan, allowing courts to address the "clearly established" prong of the qualified immunity test before deciding whether a constitutional violation had occurred. 129 S. Ct. 808, 811, 172 L. Ed. 2d 565 (2009).

B. Excessive Force

The Fourth Amendment protects individuals against "unreasonable searches and seizures." To state a claim of excessive force under the Fourth Amendment, a plaintiff must show both that a "seizure" occurred and that the seizure was "unreasonable." Brower v. County of Inyo, 489 U.S. 593, 599, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989). "While it is not always clear when minimal

6

police interference becomes a seizure, there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Tennessee v. Garner, 471 U.S. 1, 7, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985).

The elements necessary to prove an excessive force claim under Section 1983 are a significant injury which resulted directly and only from the use of force that was clearly excessive to the need, and the excessiveness of which was objectively unreasonable. See Carter v. Fenner, 136 F.3d 1000, 1010 (5th Cir. 1998)(citing Johnson v. Morel, 876 F.2d 477, 480 (5th Cir. 1989) (en banc)). Further, in order to determine the objective reasonableness of the use of force in a particular situation, courts must judge from the perspective of a reasonable officer on the scene. See id. (citing Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)).

Here, there is no dispute that Gordon suffered a significant injury. Thus, the question is whether the amount of force used by Officer Williams was clearly excessive and objectively unreasonable. Focusing on the "objectively unreasonable" analysis,

> [t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . . [T]he "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

Reese v. Anderson, 926 F.2d 494, 500 (5th Cir. 1991). This test "allow[s] for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397, 109 S. Ct. 1865. The test for reasonableness also must consider "whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396, 109 S. Ct. 1865.

7

The issue is whether Officer Williams acted reasonably when he shot Gordon. In doing so, this Court considers relevant Fifth Circuit case law.

In Mace v. City of Palestine, 333 F.3d 621 (5th Cir. 2003), the Fifth Circuit considered the reasonableness of an officer's use of deadly force. The Fifth Circuit summarized the facts as follows:

> On April 16, 2001, police in the City of Palestine, Texas, responded to complaints of a disturbance at a mobile home park. Officers arriving on the scene found Jacob Vincent Revill ("Revill") inside a mobile home with the door open, yelling, cursing, brandishing an eighteen to twenty inch sword and breaking windows. Blood was on his hands and on the broken windows. The officers, with weapons draw, told Revill to drop the sword. Revill told the officers to stay away from him and threatened to kill himself. He claimed to be an expert in martial arts and made several martial arts motions with the sword in an effort to keep the officers at bay. Revill demanded to talk to Chief of Police Pat Henderson. Henderson arrived on the scene and attempted to calm Revill by talking to him. Revill remained agitated, cursing his father and his girlfriend, and continued yelling and brandishing the sword. Henderson told Revill to drop the sword and not advance on the officers. He offered to take Revill to see a doctor or psychologist. While Henderson was talking to him, Revill exited the mobile home. Revill continued to brandish and make punching motions with the sword. During this time, Revill was between eight and ten feet away from the officers. When Revill turned, and raised the sword toward the officers, Henderson shot Revill in his right arm, causing him to drop the sword . . . . Revill died at the hospital.

Id. at 622-23.

The Fifth Circuit concluded:

> Henderson was faced with an intoxicated, violent and uncooperative individual who was wielding a sword within eight to ten feet of several officers in a relatively confined space. It is not objectively unreasonable for an officer in that situation to believe that there was a serious danger to himself and the other officers present. Although, in retrospect, there may have been alternative courses of action for Henderson to take, we will not use "the 20-20 vision of hindsight" to judge the reasonableness of Henderson's use of force. Graham, 420 U.S. at 396, 109 S. Ct. 1865. Henderson's use of force against Revill was not objectively unreasonable; therefore, it was not in violation of the Constitution. Because Henderson did not violate Revill's constitutional right to be free from excessive force, he is entitled to qualified immunity from suit on Mace's excessive force clam . . . .

Id. at 625.

In Hudspeth v. City of Shreveport, 2008 WL 749547 (5th Cir. 2008), an unpublished opinion, the Fifth Circuit used videotape evidence to determine that the officer's actions were objectively reasonable. The videotape showed Hudspeth pointing a cell phone in the officers' direction, resisting interaction with them, tussling with and officer, suddenly facing the officers, and attempting to flee. Both officers fired their weapons, and Hudspeth, unarmed other than with the cell phone, was shot in the back and killed. The incident took approximately seven seconds. Because the officers had an articulable basis to believe Hudspeth was armed and could reasonably have perceived him as posing a threat of serious bodily harm, the Fifth Circuit concluded that the officers' actions were objectively reasonable.

Applying the Fourth Amendment's objective reasonableness standard, this Court must determine the reasonableness of Deputy Williams' use of deadly force in light of the facts and circumstances confronting him at the time he acted, without regard to his underlying intent or motivation. Graham, 490 U.S. at 396, 109 S. Ct. 1865. Deputy Miley approached Gordon on the staircase and requested he come down and speak with him about the disturbance that happened earlier in the evening. Gordon retreated up the stairs away from Deputy Miley, drew a chrome object, and pointed it at the officer. Deputy Williams arrived at the scene and drew his gun. Both officers ordered Gordon to drop the weapon. Gordon refused to drop the weapon. After realizing Gordon had a nail gun, Deputy Williams holstered his gun, and the officers decided to subdue Gordon with tasers.

Deputy Williams moved in closer to get a better shot at Gordon with his taser. Gordon struck Deputy Williams in the shoulder and on the top of his head. Williams was knocked to the

ground. After Deputy Williams gained his composure, he witnessed Gordon on top of Deputy Miley repeatedly striking the officer over the head with the chrome object. Deputy Williams testified Miley was bleeding profusely from his head and appeared to be unconscious. Williams also was bleeding from his head injuries. At that point, Williams made the split-second decision to use deadly force. Deputy Williams drew his gun and shot Gordon multiple times. According to the officer, Gordon then was handcuffed just in case he was still a threat.

The Court finds Deputy Williams' use of deadly force was not unreasonable because he had reason to believe that Gordon posed a threat of serious harm to himself and others. Garner, 471 U.S. at 11, 105 S. Ct. 1694. Williams' actions were a result of responding to a serious threat quickly and decisively. That his decision is now subject to second-guessing, even legitimate second-guessing, does not make his actions objectively unreasonable given the particular circumstances of the shooting. See Stroik v. Ponsetti, 35 F.3d 155, 158-59 (5th Cir. 1994)("'[W]e must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policeman face everyday. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.'" (quoting Smith v. Freland, 954 F. 2d 343, 347 (6th Cir. 1992)).

Deputy Williams' actions were objectively reasonable; thus, the Court concludes that he did not violate Gordon's Fourth Amendment rights. Because Deputy Williams did not violate Gordon's constitutional right to be free from excessive force, he is entitled to qualified immunity from suit on Plaintiffs' excessive force claim.

II.     Official Capacity claims/Municipal Liability

Plaintiff sued Deputy Miley and Deputy Williams in their official capacities. Claims against

government agents or officers in their official capacities are essentially claims against the governmental entity itself. The suit is against the office that the employee holds and not the actual employee. See Brandon v. Holt, 469 U.S. 464, 471-72, 105 S. Ct. 873, 83 L. Ed. 2d 878 (1985). "Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" Kentucky v. Graham, 473 U.S. 159, 165, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)(quoting Monell v. City of New York Dept. of Social Services, 436 U.S. 658, 690 n.55, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)).

Plaintiffs claim that the acts, customs, and policies of the Lowndes County Sheriff's Department amounted to deliberate indifference to Gordon's constitutional rights and proximately caused his injuries. Specifically, Plaintiffs allege that (1) Lowndes County failed to provide adequate and reasonable procedures for hiring, training, supervision, and discipline of Deputies Miley and Williams; (2) Lowndes County had actual or constructive knowledge of both Gordon's special needs[3] and the persistent, widespread practice of the use of excessive force by its officers; and (3) Lowndes County permitted and tolerated a policy and practice of excessive use of force.

Under 28 U.S.C. § 1983, the United States Supreme Court has held that "[m]unicipal liability, based on the actions of city officials, exists only where it can be shown that the officials acted in accordance with an official government policy or firmly entrenched custom." Monell, 436 U.S. 658, 694-95, 98 S. Ct. 2018. In the Fifth Circuit, "[p]roof of municipal liability sufficient to satisfy Monell requires: (1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy (or custom)." Pineda v. City of Houston, 291 F.3d 325, 328 (5th Cir. 2002).

---

[3] Plaintiffs contend Gordon suffered from mental illness, and that the officers were not trained to handle the mentally ill.

"[A] plaintiff must . . . demonstrate a direct causal link between the *municipal action* and the deprivation of federal rights." Bd. of County Comm'r v. Brown, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). In Pineda, the Fifth Circuit stated that to prove "municipal liability in the absence of a 'smoking gun' [there are] two paths of proof:"

> 1. A policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
>
> 2. A persistent, widespread practice of city officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy as above defined.

Pineda, 291 F.3d at 328 (citing Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir. 1984)).

For Plaintiffs to prevail, they must show that Deputies Miley and Williams were following a county policy or custom when they allegedly used excessive force against Gordon. See City of St. Louis v. Praprotnik, 485 U.S. 112, 122, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights."). To prove the existence of a custom, Plaintiffs must show a "persistent and widespread practice" of Lowndes County employees inflicting, on other occasions, the specific constitutional violations that they allege; "one act is not itself a custom." Pineda, 291 F. 3d at 329 (citing Piotrowski v. City of Houston, 237 F. 3d 567, 581 (5th Cir. 2001)).

Plaintiffs have the burden to show the existence of a Lowndes County policy or custom authorizing, instructing, or condoning the use of excessive force by its officers. Plaintiffs have failed to point to any official policy, such as a regulation or an ordinance, that authorizes its officers

to use excessive force. Moreover, Plaintiffs have failed to establish the existence of a "widespread practice" or custom of the Lowndes County Sheriff's Department authorizing the use of excessive force. Plaintiff have provided no evidence of any other claims of excessive force lodged against Lowndes County officers. A single instance of excessive force is insufficient to satisfy the predicate "pattern of conduct" necessary to establish a municipal custom. See Pineda, 291 F.3d at 329.

III.     Sheriff Butch Howard–Official and Individual Capacity

Plaintiffs assert claims against Sheriff Butch Howard, in his official and individual capacities, for inadequate training, supervision, and hiring in violation of the Fourteenth Amendment. Plaintiffs do not allege Sheriff Howard was present for or involved in the excessive force incident described above. Rather, Plaintiffs seek to hold him liable for hiring Deputies Williams and Miley and for failing to properly train and supervise.

As to the official capacity claim, an allegation of inadequate training may result in municipal liability when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." City of Canton, Ohio v. Harris, 489 U.S. 378, 390, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). However, an allegation that "a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city." Id. at 390, 109 S. Ct. 1197. A single incident of inadequate training is insufficient to warrant a finding of deliberate indifference; rather, the plaintiff must show a pattern of similar violations to establish such a finding. Estate of Davis v. City of North Richland Hills, 406 F.3d 375, 382-83 (5th Cir. 2005). The plaintiff must also prove the existence of a direct causal link between the inadequate training and the plaintiff's constitutional deprivation. Harris, 489 U.S. at 385-86, 109 S. Ct. 1197.

13

Plaintiffs failed to identify any evidence that the Lowndes County Sheriff Department policies on the use of force are inadequate. Moreover, Plaintiffs have failed to show any persistent widespread practice by Lowndes County of inadequate training, supervision, or hiring. Plaintiffs have offered no evidence to the Court which would create a question of fact regarding Lowndes County's alleged deliberate indifference. Without some competent evidence demonstrating a failure by Lowndes County or Sheriff Howard to adequately train or supervise its officers, Plaintiffs' deliberate indifference claim must fail. Due to the absence of evidence concerning deliberate indifference, Lowndes County and Sheriff Howard are entitled to summary judgment on Plaintiffs' failure to train claim.

Likewise, an allegation of improper hiring may constitute deliberate indifference resulting in municipal liability "where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right . . . ." Bd. of County Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 411, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). Again, Plaintiffs have shown nothing to indicate Deputies Miley and Williams were improperly hired; thus, Lowndes County is entitled to summary judgment on Plaintiffs' improper hiring claim.

As to claims against Sheriff Howard in his individual capacity, "supervisory officials cannot be held liable for the actions of subordinates under any theory of vicarious liability." Thompkins v. Belt, 828 F.2d 298, 304 (5th Cir. 1987) (citations omitted). Rather, supervisory officials may be held liable for a Section 1983 violation only if they either were personally involved in the constitutional deprivation or if there is a "sufficient causal connection between the supervisor's

wrongful conduct and the constitutional violation." Id.

As mentioned above, Plaintiffs do not allege Sheriff Howard was personally involved in the alleged excessive force incident at issue. Rather, Plaintiffs seek to hold him liable for hiring Deputies Williams and Miley and for failing to properly train and supervise. The Fifth Circuit has held that "[a] sheriff not personally involved in the acts that deprived the plaintiff of his constitutional rights is liable under section 1983 if: 1) the sheriff failed to train or supervise the officers involved; 2) there is a casual connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and 3) the failure to train or supervise constitute deliberate indifference to the plaintiff's constitutional rights." Thompson v. Upshur County, TX, 245 F. 3d 447, 459 (5th Cir. 2001).

There is no evidence before this Court that Sheriff Howard failed to adequately train or supervise Officers Williams and Miley. Even assuming Sheriff Howard did fail to adequately train or supervise the officers, Plaintiffs have not shown a casual connection between the alleged failure and the alleged constitutional violation, or that Sheriff Howard acted with deliberate indifference. Accordingly, Sheriff Howard is entitled to summary judgment on Plaintiffs' claims against him in his official and individual capacities.

IV.     Other Federal Claims

    A.     Equal Protection

Plaintiffs' Complaint alleges that the actions of the Defendants denied Gordon "the same protection of the laws which is enjoyed by other persons or other classes in like circumstances in their lives, liberty, property, and in their pursuit of happiness." Defendants argue this claim is inapposite to the facts at hand. Plaintiffs fail to address this claim in their response to summary judgment.

15

Under the Fourteenth Amendment's Equal Protection Clause, persons similarly situated should be treated alike. See Williams v. Bramer, 180 F.3d 699, 705 (5th Cir. 1999). To successfully make a claim under the Equal Protection Clause, a Section 1983 plaintiff must allege that a state actor intentionally discriminated against him because of membership in a protected class. See id. Further, the plaintiff must demonstrate that the purposeful discrimination motivating the state action caused the complained-of injury. See Johnson v. Rodriguez, 110 F.3d 299, 306-307 (5th Cir. 1997). "Discriminatory purpose in an equal protection context implies that the decisionmaker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group."

The Court has to assume, as the Plaintiffs have not specified, that Plaintiffs allege Gordon was fatally shot because of his race. While it is true that Gordon was black, and the officers involved in the shooting are white, there is nothing in the record to suggest that the officers selected their course of action because of Gordon's race. Plaintiffs have failed to establish that the officers allegedly wrongful conduct was intentional or purposeful discrimination based on race, as required by the Equal Protection Clause. Accordingly, summary judgment is granted as to Plaintiff's equal protection claims against the officers.

Plaintiffs also asserted a Section 1983 claim against Lowndes County for violation of the Equal Protection Clause. Because there was a finding of no violation of Gordon's equal protection rights and no viable equal protection claim against any individual defendant, there can be no municipal or supervisory liability with respect to an equal protection claim. Accordingly, summary judgment is likewise granted as to Plaintiffs' equal protection claim against Lowndes County.

B.     First Amendment

As for Plaintiffs' First Amendment claim, Plaintiffs failed in their Complaint and in their response to summary judgment to identify the rights guaranteed by the First Amendment of which Gordon was deprived and to assign any evidentiary details to that allegation. The Court finds no basis in the alleged facts set forth in the Complaint for any basis for a First Amendment claim. Therefore, Plaintiffs' First Amendment claim is dismissed.

V.    State Law Claims[4]

    A.    Lowndes County–Official Capacity Claims

To the extent Plaintiffs have alleged common law tort claims against the officers in their official capacity as deputy sheriffs of Lowndes County, these claims are properly construed as having been made directly against Lowndes County under the Mississippi Tort Claims Act ("MTCA"), Mississippi Code Section 11-46-1, *et seq.* See MISS CODE ANN. § 11-46-7(2) ("[N]o employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties."). The MTCA is the exclusive remedy available to plaintiffs seeking money damages from the state or its political subdivisions. MISS. CODE ANN. § 11-46-7.

Plaintiffs allege state law claims for intentional and/or negligent infliction of emotional distress and civil assault and battery. Mississippi Code Section 11-46-9(c) states that a government entity shall not be liable for any claim,

> [A]rising out of any act or omission of an employee . . . engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in disregard of the safety and well-being of any person not engaged in criminal activity at the time of the injury.

MISS. CODE ANN. § 11-46-9(c).

---

[4] Plaintiffs failed to even mention the state law claims in their response to summary judgment.

For Lowndes County to receive this immunity, there must be a causal connection between Gordon's criminal activity and the tortfeasor's wrongdoing. Estate of Williams v. City of Jackson, 844 So. 2d 1161, 1165 (Miss. 2003). Directly at issue is (1) whether Gordon was engaged in criminal activity at the time Deputy Williams assaulted him, and (2) whether Gordon's criminal activity caused Deputy Williams to assault him. Although Plaintiffs contend the officers should have handled the situation differently, Plaintiffs do not dispute Gordon struck both officers over the head multiple times during the altercation, and Gordon was hitting Deputy Miley over the head when Deputy Williams fired his gun. Therefore, it is undisputed Gordon was engaged in criminal activity when Deputy Williams shot him.

Since Gordon was engaged in criminal activity at the time the alleged battery occurred, and inasmuch as criminal activity caused Officer Williams' alleged wrongdoing, the MTCA provides Lowndes County with immunity on Plaintiffs' state law claims. Therefore, Lowndes County is entitled to summary judgment on Plaintiffs' state law claims.

B. Deputies Miley and Williams–Individual Capacity Claims

The MTCA provides, "no employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties . . . ." MISS. CODE ANN. § 11-46-7(2). In paragraphs two and three of their Complaint, Plaintiffs allege that at all relevant times, Defendants Williams and Miley acted in the scope and course of their employment. Thus, it is undisputed that Miley and Williams were within the scope of their employment when Gordon was shot. Moreoever, the MTCA raises a rebuttable presumption that an individual is acting within the scope of his employment when the act complained of occurred "within the time and at the place of [his] employment . . . ." MISS. CODE ANN. § 11-46-5. Plaintiffs have not rebutted this presumption

18

in their reponse or even mentioned the state law claims.

Plaintiffs' assertion that Deputies Miley and Williams were in the scope of their employment is calamitous to their state law tort claims against them in their individual capacity. The doctrine of judicial estoppel prevents Plaintiff from now claiming the officers were acting outside the scope of their employment at the time of the shooting. Dockins v. Allred, 849 So. 2d 151, 155 (Miss. 2003) ("Because of judicial estoppel, a party cannot assume a position at one stage of a proceeding and then take a contrary stand later in the same litigation."). Accordingly, Defendants Miley and Williams are entitled to summary judgment on Plaintiffs' state law claims against them in their individual capacity.

## CONCLUSION

Based on the foregoing analysis, the Court finds that Plaintiffs' Section 1983 claims against Defendants under the Equal Protection Clause fail on the merits, as they presented no competent summary judgment evidence of intentional and purposeful discrimination based on race. Plaintiffs' claims against Defendants under the First Amendment are dismissed, as the Court finds no facts to support such a claim. Plaintiffs' Section 1983 claims against Officers Williams and Miley for violation of the Fourth Amendment are dismissed, as the officers are entitled to qualified immunity. Plaintiffs' Section 1983 supervisory and municipal claims against Lowndes County and Sheriff Howard likewise fail. Lastly, Defendants' are entitled to summary judgment on Plaintiffs' state law claims.

Accordingly, Defendants' Motion for Summary [32] and Motion for Summary Judgment on Qualified Immunity [53] are GRANTED.

A separate order in accordance with this opinion shall issue this day.

SO ORDERED, this the 15th day of September 2009.

/s/ Sharion Aycock
**UNITED STATES DISTRICT JUDGE**